**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

12 CV 6842

|  |  |
|---|---|
| MARK MCNULTY, on Behalf of Himself and All Others Similarly Situated, | X Case No.<br>:<br>: |
| Plaintiff, | : CLASS ACTION COMPLAINT FOR<br>: VIOLATION OF FEDERAL SECURITIES<br>: LAWS |
| v. | : |
| ROBERT L. KANODE and DONALD E. GOTTSCHALK, | :<br>:<br>: |
| Defendants. | :<br>X |



## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased Valence Technology, Inc. ("Valence" or the "Company") securities between August 3, 2011 and July 12, 2012, inclusive (the "Class Period"), against certain of Valence's officers and directors for violations of the Securities and Exchange Act of 1934 (the "Exchange Act"). This matter arises out of false and misleading statements about the Company's capital position, liquidity, and business prospects as a going concern.

2.      Founded in 1989, Valence develops lithium iron magnesium phosphate rechargeable batteries. Its products are used in hybrid and electric vehicles, as well as hybrid boats and Segway, Inc. personal transporters. The lithium-ion battery industry has a long history of false starts, promising innovations, and unfulfilled potential. Since its inception in 1989, Valence has not achieved profitable operations and, thus, has financed its operating activities primarily through the sale of equity securities and the issuance of debt. Most importantly, the Company relied on Carl E. Berg ("Berg"), Valence's Chairman of the Board of Directors (the "Board") and largest shareholder, who has pumped more than $100 million into Valence over the years and owns a substantial amount

of its debt. By July 2012, the end of the Class Period, the Company owed Berg and his companies $69.1 million in loans.

3.      Notwithstanding Berg's tremendous financial backing for the Company, Valence still could not keep up with its debts and Berg grew tired of supporting a business that was not performing. The Company had no further commitments for financing by Berg or his affiliates. In addition, by March 31, 2012, the Company's principal sources of liquidity were cash and cash equivalents of only $1.4 million. Cash on hand and cash generated by operations would not be sufficient to fund the Company's operating and capital needs for the next twelve months. Defendants (as defined herein) knew or recklessly disregarded the fact that Valence was headed for bankruptcy and would not be able to continue as a going concern.

4.      Despite Defendants' knowledge or reckless disregard of the grim realities facing the Company, they downplayed the severity of the Company's capital position. Defendants consistently misled investors about the Company's business health and future prospects by evading inquiries concerning Valence's liquidity and assuring the market of the Company's available alternatives for raising capital. Defendants reassured investors that "*there is no pressing urgency to do any other funding at the moment*" and that Valence has "*very strong financial support.*" Defendants stated that they were "*very comfortable going forward that [they] can secure funding for both [the Company's] daily activities and [its] growth.*" Moreover, Defendants repeatedly touted Berg as "*a very strong supporter of this company,*" who had continuously been relied upon in financing Valence.

5.      Defendants would not admit the fact that the Company was headed for bankruptcy, even when analysts and investors targeted this specific issue. Instead, Defendants responded to concerns over dwindling cash reserves by reiterating that the Company was "*evaluating a number of*

*short- and long-term funding alternatives.*" Further, Defendants provided assurances that they believed that the Company has "*an excellent future in front of*" it.

6. Despite all of these positive statements, however, the Company was facing a $3 million loan payment by July 3, 2012 and did not have enough cash to meet its outstanding obligations. Worse, Berg had cut off funding. Defendants could no longer keep up with their façade. Berg's decision to finally bring an end to his losses in Valence forced the Defendants' hand and caused their house of cards to collapse. On July 12, 2012, nine days after the Company's loan payment was due, Valence issued a press release disclosing to investors that the Company "filed a voluntary petition for a chapter 11 business reorganization in the U.S. Bankruptcy Court for the Western District of Texas."

7. When the true state of the Company's business health became public, Valence's shares sank from a closing pricing of $0.65 on July 13, 2012, to a closing price of $0.05 at the end of the day on July 16, 2012. This amounted to a three-day decline of over 92%.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under section 10(b) and section 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5.

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, 15 U.S.C. §78aa.

10. This Court has jurisdiction over each defendant named herein because each defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the NASDAQ Global Market.

**PARTIES**

13.     Plaintiff Mark McNulty purchased securities of Valence during the Class Period as set forth in the accompanying certification, incorporated by reference herein, and was damaged as a result of Defendants' wrongdoing as alleged in this Complaint.

14.     Defendant Robert L. Kanode ("Kanode") is Valence's Chief Executive Officer ("CEO"), President, and a director, and has been since March 2007. Throughout the Class Period, defendant Kanode made false and misleading statements regarding the Company's capital position, liquidity, and prospects as a going concern. Defendant Kanode, because of his positions with Valence, had a substantial role in the day-to-day operations of the Company and possessed the power and authority to: (i) direct or cause the direction of the management and polices of the Company's employees; and (ii) control the contents of the Company's annual reports, press releases, and presentations to securities analysts, money and portfolio managers, and investors, i.e., the market. Defendant Kanode was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of defendant Kanode's positions with the Company, and his access to material, non-public information available to him but

not to the public, defendant Kanode knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

15.     Defendant Donald E. Gottschalk ("Gottschalk") is Valence's Acting Chief Financial Officer ("CFO") and has been since June 2011. Defendant Gottschalk was also Valence's Corporate Controller from August 2007 to June 2011. Throughout the Class Period, defendant Gottschalk made false and misleading statements regarding the Company's capital position, liquidity, and prospects as a going concern. Defendant Gottschalk was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of defendant Gottschalk's positions with the Company, and his access to material, non-public information available to him but not to the public, defendant Gottschalk knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

16.     Non-party Valence is a Delaware corporation that develops, manufactures, and sells advanced energy storage systems utilizing its proprietary phosphate-based lithium-ion technology. The principal executive offices of Valence are located at 12303 Technology Boulevard, Suite 950, Austin, Texas. On July 12, 2012, Valence announced that it "filed a voluntary petition for a chapter 11 business reorganization...."

17.     The defendants named in ¶¶14-15 are sometimes collectively referred to herein as the "Defendants."

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

18.     Defendants are liable for: (i) making material false statements; and (ii) failing to disclose material, adverse facts known to them about Valence. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Valence securities was a success, as it: (a) deceived the investing public as to Valence's business prospects and operations; (b) kept the price of Valence securities artificially inflated; and (c) caused plaintiff and other members of the Class (as defined herein) to purchase Valence securities at inflated prices.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

19.     Notwithstanding Berg's tremendous financial backing for the Company, Valence still could not keep up with its debts and Berg grew tired of supporting a business that was not performing. Defendants knew or recklessly disregarded the fact that Valence was headed for bankruptcy and would not be able to continue as a going concern without Berg's financial support. Given the pressures in maintaining investor confidence, however, Defendants deliberately or with extreme recklessness misled the public concerning the Company's financial condition and business prospects, failing to disclose the Company's impending bankruptcy until it was too late.

20.     On August 3, 2011, Valence hosted a conference call with investors, media representatives, and analysts to discuss the Company's first quarter 2012 financial results. During the conference call, defendant Kanode assured the market of the Company's prospects as a going concern. The exchange between the unidentified participant and defendant Kanode was as follows:

**Unidentified Participant**

Good job. The first question I want to ask you is regarding the financing activities this past quarter. *I see the cash [is at] $11.6 million.* Don mentioned $2 million something from Berg and I believe $12 million through the [At Market Issuance Sales Agreement]. Can you comment at what price you raised that money, why you raised the money and who was behind the purchase? That's my first question.

**Robert Kanode, Valence Technology, Inc. -** *President and CEO*

Well, first of all, it was a -- we sold this off-the-shelf, we cannot comment about the customers who bought it. And that's about all I can tell you. We are preparing — I mean, you can look at the stock price of the past quarter and pretty much understand what it was sold for. Some of those funds will go towards expansion as we complete our planning, and the balance of those funds will go towards our work in process and normal expenses during manufacturing.

**Unidentified Participant**

Do you see yourself being very active with the [At Market Issuance Sales Agreement] going forward the next three to six months? Or *is this enough to keep you guys going until break-even*?

**Robert Kanode, Valence Technology, Inc. - *President and CEO***

I can only tell you at this point, we have no plans to do this or not do this at the moment. In other words, *there is no pressing urgency to do any other funding at the moment.*

21.     On February 8, 2012, Valence hosted another conference call with investors, media representatives, and analysts discussing the Company's third quarter 2012 financial results. During this conference call, defendant Kanode was questioned about the Company's progress toward its breakeven point. Defendant Kanode touted the Company's financial results, and reassured investors that the Company was close to breaking even. Defendant Kanode failed to disclose the fact that the Company would not be able to actually reach the breakeven point because it did not have enough money to survive as a going concern. Worse, when questioned about whether the Company has a reliable source of cash to get to the breakeven point, defendant Kanode stated that Valence has "*very strong financial support*" and that he feels "very comfortable going forward that we can secure funding for both our daily activities and our growth." The exchange between the investor participating on the call and defendant Kanode was as follows:

**Ron Stewart - *Private Investor***

Following up on the breakeven discussion, even though you're not able to see when that might be achieved, can you tell us if the sales amount of breakeven has -- is now what?

**Bob Kanode, Valence Technology, Inc. -** *President, CEO*

$18 million to $20 million per quarter.

**Ron Stewart - Private Investor**

Okay. Are you satisfied that Valence has a reliable source of cash to get us to breakeven?

**Bob Kanode, Valence Technology, Inc. -** *President, CEO*

*We have very strong financial support from a number of different areas, and I feel very comfortable going forward that we can secure funding for both our daily activities and our growth.*

And I might also add when you're looking at our -- when I commented breakeven is $18 million to $20 million, in our first quarter of this past year that we just closed, we had a quarter of $14.1 million. And in two of those three months in that quarter, we broke even. So we feel very comfortable that our model is solid at $18 million to $20 million.

22.     On February 23, 2012, Valence presented at Jeffries Global Clean Technology Conference. At this conference, defendant Kanode further quelled any concerns regarding the Company's liquidity and prospects as a going concern by concluding that, Berg *"is a very strong supporter of this company"* and has been continuously relied upon in financing the Company. Moreover, defendant Kanode downplayed the Company's dwindling cash on hand by stating that *"[m]oving forward our cash needs will not be significant."* The exchange between the unidentified audience member participating in the conference and defendant Kanode was as follows:

**Unidentified Audience Member**

On the balance sheet, just a little color on where you are at right now; cash, debt.

**Robert Kanode, Valence Technology, Inc. -** *President & CEO*

*Our major shareholder is our founder, Carl Berg, who owns about 50% of the Company. Carl is a very strong supporter of this company and, therefore, with very little cash needs quarter to quarter, we look at two different funding options. We have used a shelf and also Carl, if you look at our history.*

*Moving forward our cash needs will not be significant, but we do anticipate we need to balance the foundation of the Company and probably do a modest offering*

*in the future, which we intend to do.* However, we want to bring some of the projects that we have on the table to the light of day first so you can better gauge our process which isn't long term.

23.    On May 23, 2012, Valence issued a press release in which defendant Kanode touted the Company's future business prospects. Defendant Kanode stated that "we are confident that our experience, quality, and engineering support will continue to distinguish Valence in our growing markets." Defendant Kanode failed to disclose, however, that Valence and its shareholders would not be able to capitalize on these "growing markets" and other future business prospects because the Company was facing bankruptcy and could not continue as a going concern. The press release stated in part:

> "We have seen continued progress with commercial motive customers such as Segway, PVI, Optare, and Electric Vehicles International. During the past year, we also expanded our business into a number of sectors, with particular success in the industrial/medical sector where we now supply systems to significant corporations such as Rubbermaid Medical and Howard Technology. Additionally, we have developed strong relationships with customers in the motive and back-up power sectors who see value through the return on investment our advanced U-Charge® family of lithium phosphate batteries offer. *Looking to the future, we are confident that our experience, quality, and engineering support will continue to distinguish Valence in our growing markets*," said Robert L. Kanode, president and chief executive officer of Valence Technology.

24.    On May 23, 2012, Valence hosted a conference call with investors, media representatives, and analysts, during which defendants Kanode and Gottschalk faced growing investor concerns over the Company's liquidity. Despite the fact that Valence has reported a mere $1.4 million in dwindling cash reserves, and the fact that the Company was struggling to receive any additional financing, defendant Kanode would not admit the fact that the Company was headed for bankruptcy. Instead, defendant Kanode reiterated that the Company was "evaluating a number of short- and long-term funding alternatives" and that he believes that the Company has "an excellent future in front of" it. Defendant Kanode stated that the Company is "poised to move forward and [has] all the right tools to do so." Valence did not, however, have the right tools to continue as a

going concern as its dangerously low cash reserves were not enough to cover its liabilities, including, but not limited to, its impending loan obligations.  The exchange between the analyst and investor participating on the call and defendant Kanode was as follows:

**Rob Young, Wm Smith & Co. –** *Analyst*

Okay, okay.

*And then a follow-up pertains to capital positions. It looks like you have got about $1.4 million on the balance sheet in cash.*

*I was curious just kind of if you could talk about your comfort level with that amount of cash* and any opportunities to increase that cash position either through free cash flow -- are there any opportunities with that? Or are you looking to probably go to the markets somehow?

**Robert Kanode, Valence Technology, Inc. -** *President and CEO*

Well, you're right, at the yearend we were at $1.4 million. And very simply stated *we are evaluating a number of short- and longterm funding alternatives,* which is not very easy for anyone in this economy I might add. But we are looking at short- and long-term alternatives.

\* \* \*

**Paul Ling -** *Private Investor*

Hi, Mr. Kanode. Says the book value of the stock for Valence is negative $0.35 per share. *What is the probability that the company can declare bankruptcy and let Mr. Berg take over so the investors get nothing?*

**Robert Kanode, Valence Technology, Inc. -** *President and CEO*

*We believe we have an excellent future in front of us. Our technology is one of the largest patent estates in the world in lithium phosphate. Lithium phosphate is becoming the go-to technology for safety and long life. We have a library of standard products if you will that are performing extremely well that have been designed over years. We have the fundamentals to move forward, and I feel very comfortable with those fundamentals. There is no doubt we're in a very difficult market and there is no doubt that the emergence of lithium has not been predictable.*

*Given all of that, we believe we are poised to move forward and we have all the right tools to do so. And that is our position and we feel pretty good about it.*

**Paul Ling** - *Private Investor*

*But there is no guarantee that the company cannot declare bankruptcy?*

**Robert Kanode, Valence Technology, Inc.** - *President and CEO*

*You know I cannot give you guarantees of the future performance of the economy or other areas. I can only report to you that we have the tools to basically move forward with a great product line, and we're seeing very good markets that need it.*

25.    In this May 23, 2012 conference call, defendant Gottschalk also downplayed the Company's liquidity concerns by pointing to the fact that Valence's "cash used in operations" had "dropped dramatically" so the Company was *"really in a very, very good position right now to sustain [itself] going forward."* When pressed by Neil Donna, an analyst at Yose Capital, regarding the Company's alternatives for dealing with its liquidity issues, defendant Gottschalk stated that Valence was focusing primarily on raising equity and would continue as a going concern "mostly through the sale of stock." The exchange between the analyst and defendant Gottschalk was as follows:

**Neil Donna, Yose Capital** – *Analyst*

*Hey, guys. Yes, just a follow-up on the liquidity situation. I'm a little concerned that you guys let it get to $1.3 million.* I guess it looks like you burned more than that in Q4. And so I'm just trying to understand basically you know how you guys think about managing the cash burn going forward. I know you guys have great technology and you have a great pipeline ahead of you, but how do you guys think about managing the cash burn and the working capital going forward with $1 million of cash and 300 people on payroll?

**Don Gottschalk, Valence Technology, Inc.** - *Acting CFO*

This is Don. And as Bob said before *we are evaluating a lot of short-term and long-term funding alternatives.* And if you look at --you'll see on our 10-K that is filed today, and what we mentioned earlier that *our cash used in operations from last year to this — from the previous year to this last year dropped dramatically.* And *so we're really in a very, very good position right now to sustain ourselves going forward,* but we are obviously looking at those different opportunities and those are yet to come.

**Neil Donna, Yose Capital – *Analyst***

***What alternatives*?** I mean it's just time isn't your friend right now in this market.

**Don Gottschalk, Valence Technology, Inc. - *Acting CFO***

Well, the different opportunities would be borrowings as necessary and also raising equity through the sale of stock and other – just in any other methods that we could come up with for now, but *mostly through the sale of stock*.

### REASONS THE STATEMENTS WERE FALSE AND MISLEADING

26.     The true facts, which were known by Defendants but concealed from the investing public during the Class Period, were that:

      (a)     Berg would no longer pump money into the Company and save it from its debts;

      (b)     Valence was not going to raise capital by selling equity;

      (c)     Valence was not finding any favorable financing opportunities; and

      (d)     As a result of the foregoing, the Company was headed for bankruptcy and would not survive as a going concern.

### THE TRUTH IS REVEALED

27.     On July 12, 2012, less than two months after Defendants assured the market of the Company's ability to sustain itself going forward, Valence issued a press release disclosing to investors that the Company "filed a voluntary petition for a chapter 11 business reorganization in the U.S. Bankruptcy Court for the Western District of Texas." The Company did not raise equity; nor did it find any favorable financing opportunities to stay afloat.  The press release stated:

> AUSTIN, Texas, July 12, 2012 (GLOBE NEWSWIRE) -- *Valence Technology, Inc. (the "Company") announced today that it filed a voluntary petition for a chapter 11 business reorganization in the U.S. Bankruptcy Court for the Western District of Texas.*
>
> The business reorganization is intended to bolster the Company's liquidity in the U.S. and abroad and enable the Company to focus on its core lithium phosphate markets.

Valence is currently negotiating a debtor-in-possession credit facility and expects to

announce the facility shortly. Once in place, this facility will be used to enhance liquidity and working capital and will be subject to Court approval and other conditions. With a credit facility, the Company believes that it will have sufficient liquidity to operate its business during chapter 11, and to continue the flow of goods and services to its customers in the ordinary course.

The Company expects to pay employee wages and benefits and continue customer programs. Subsidiaries outside of the U.S. are not subject to the bankruptcy proceedings and are expected to continue to operate in the ordinary course of

business. Valence plans to honor all post-petition obligations to suppliers in the

ordinary course.

*"After careful consideration of the implications of chapter 11 and weighing them against a lack of attractive alternatives, the Board of Directors and the senior management team believe that this is a necessary step and the right thing to do for the future of Valence,"* said Robert L. Kanode, Valence's president and chief executive officer. "Our goal is to continue to operate and meet customer requirements as we work through the chapter 11 process as quickly as possible. We are fully committed to working with our valued customers."

28.     As a result of Defendants' false statements, Valence's stock traded at artificially

inflated levels during the Class Period. However, when the true state of the Company's business

health became public, Valence's shares sank from a closing pricing of $0.65 on July 13, 2012, to a

closing price of $0.05 at the end of the day on July 16, 2012. This amounted to a three-day decline

of over 92% on volume of over thirty-one million shares.

## LOSS CAUSATION

29.     During the Class Period, as detailed herein, the Defendants made false and misleading

statements and engaged in a scheme to deceive the market. Defendants' course of conduct

artificially inflated the price of Valence securities and operated as a fraud or deceit on Class Period

purchasers of Valence securities by misrepresenting the Company's business health and prospects. Later, when the Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Valence securities fell precipitously, as the prior artificial inflation came out of the price over time.   As a result of their purchases of Valence securities during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## FRAUD-ON-THE-MARKET DOCTRINE

30.    At all relevant times during the Class Period the market for Valence securities was an efficient market for the following reasons, among others:

(a)    There has been a substantial volume in Valence securities during the Class Period;

(b)    Valence filed periodic public reports with the SEC; and

(c)    Valence regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

31.    As a result of the foregoing, the market for Valence securities promptly digested current information regarding Valence from all publicly available sources and reflected such information in the prices of the securities.   Under these circumstances, all purchasers of Valence securities during the Class Period suffered similar injury through their purchase of Valence securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

32.    The statutory safe harbor provided under the Private Securities Litigation Reform Act of 1995 for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Valence who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

33.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Valence securities during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company (including Berg), at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

34.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court. At the time Valence declared bankruptcy, it had over 169.9 million shares of stock outstanding, owned by hundreds, if not thousands, of persons.

35.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the Exchange Act was violated by Defendants;

(b)    whether Defendants omitted and/or misrepresented material facts;

(c)    whether Defendants' statements omitted material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    whether the price of Valence securities was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

36.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from Defendants' wrongful conduct.

37.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

38.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

# COUNT I

## Against Defendants for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5

39.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

40.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

41.     Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

        (a)     employed devices, schemes, and artifices to defraud;

        (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Valence securities during the Class Period.

42.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Valence securities.  Plaintiff and the Class would not have purchased Valence securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Against Defendant Kanode for Violation of
### Section 20(a) of the Exchange Act

43.      Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

44.      Defendant Kanode acted as a controlling person of defendant Gottschalk within the meaning of section 20(a) of the Exchange Act.  By reason of his positions with the Company, defendant Kanode had the power and authority to cause defendant Gottschalk to engage in the wrongful conduct complained of herein.  Defendant Kanode controlled defendant Gottschalk and all of the Company's employees.  By reason of such conduct, defendant Kanode is liable pursuant to section 20(a) of the Exchange Act.

45.      As a direct and proximate result of defendant Kanode's wrongful conduct, plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying plaintiff as a representative of the Class;

B.      Awarding plaintiff and the members of the Class damages, including interest;

C.      Awarding plaintiff reasonable costs, expert fees, and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

DATED: September 10, 2012

LAW OFFICES OF THOMAS G. AMON

THOMAS G. AMON

250 West 57th Street, Suite 1316
New York, NY 10107
Telephone: (212) 810-2430
Facsimile: (212) 810-2427
E-mail: tamon@amonlaw.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
GREGORY E. DEL GAIZO
LEONID KANDINOV
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsumeda.com
        gdelgaizo@robbinsumeda.com
        lkandinov@robbinsumeda.com

Attorneys for Plaintiff

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAW

Mark McNulty ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.    Plaintiff has reviewed the Class Action Complaint and has retained Robbins Umeda LLP as counsel in this action for all purposes.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are subject of this action:

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| VALENCE | P | 500 | 1-27-12 | $1.01 |
| VALENCE | P | 4100 | 7-07-11 | $1.21.95 |
| VALENCE | P | 4600 | 9-13-11 | $1.10 |
| | | | | |
| | | | | |
| | | | | |

4.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below: _____

_____    _____

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

7.    Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _6_ day of September, 2012.

_____
MARK MCNULTY